TUCKER ELLIS LLP
Marc R. Greenberg - SBN 123115
marc.greenberg@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:      213.430.3400
Facsimile:      213.430.3409

Attorneys for Defendant Ioan Luca

*Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis*

**TUCKER ELLIS LLP**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>IOAN LUCA,<br><br>                Defendant. | ) Case No. 2:19-cr 00354-VAP<br>)<br>) **DEFENDANT IOAN LUCA'S**<br>) **MOTION TO DISMISS FOR**<br>) **OUTRAGEOUS GOVERNMENT**<br>) **CONDUCT OR IN THE**<br>) **ALTERNATIVE, AN ADVERSE JURY**<br>) **INSTRUCTION CONCERNING THE**<br>) **GOVERNMENT'S REMOVAL OF**<br>) **EXCULPATORY WITNESSES FROM**<br>) **THE JURISIDICTION OF THE**<br>) **COURT**<br>)<br>) Date:        September 9, 2019<br>) Time:        9:00 a.m.<br>) Judge:      Virginia A. Phillips |

        COME NOW, Defendant Ioan Luca ("Luca"), by and through undersigned counsel, and submit this Motion To Dismiss For Outrageous Government Conduct, Or In The Alternative, An Adverse Jury Instruction Concerning The Government's Removal of Exculpatory Witnesses From The Jurisdiction Of The Court.

DATED:  August 12, 2019                    Tucker Ellis LLP


                                          By:    */s/ Marc R. Greenberg*
                                                 Marc R. Greenberg
                                                 marc.greenberg@tuckerellis.com
                                                 Attorneys for Defendant Ioan Luca

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

1451878.1

## <u>TABLE OF CONTENTS</u>

**Page**

I.     THE GOVERNMENT'S DETERMINATION OF WHICH
       WITNESSES THE DEFENDANTS CAN PRESENT TO THE
       JURY PREVENTS THE COURT FROM CONDUCTING A FAIR
       TRIAL. ................................................................................................5

       A.    Background. ..............................................................................5

       B.    The Court Had To Intervene To Preserve The Testimony of
             Second Engineer, Mr. Gavriluta-Strat, Before His Return To
             Romania, Over The Objection Of The Government. ....................6

       C.    Mihai George Cadar, the Ship's Electrical Engineer, Was
             Released To Return to Romania After He Provided
             Exculpatory Information To The Government............................11

       D.    Stefan Bunda, the Ship's Fitter, Was Released To Return to
             Romania After He Provided Exculpatory Information To The
             Government. ............................................................................14

II.    THE GOVERNMENT'S EFFORTS TO IMPACT WHICH
       WITNESSES THE DEFENDANTS CAN PRESENT TO THE
       JURY WARRANTS DISMISSAL OF THE INDICTMENT...............18

III.   IN THE ALTERNATIVE, THE GOVERNMENT'S
       DETERMINATION OF WHICH WITNESSES THE
       DEFENDANTS CAN PRESENT TO THE JURY WARRANTS
       AN ADVERSE JURY INSTRUCTION...................................................22

IV.    CONCLUSION ......................................................................................26

T<small>UCKER</small> E<small>LLIS</small> LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE
ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF
EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Illinois v. Fisher*
  540 U.S. 544 (2004) ........................................................................................25

*In re Oliver*
  333 U.S. 257 S. Ct. 499, 92 L. Ed. 682 (1948) ..............................................18

*Kines v. Butterworth*
  669 F.2d 6 (1st Cir.1981) ...............................................................................19

*People of the Territory of Guam v. Ngirangas*
  806 F.2d 895 (9th Cir. 1986) ............................................................................8

*U.S. v. Kojayan*
  8 F.3d 1315 (9th Cir. 1993) .............................................................................24

*U.S. v. Leal-Del Carmen*
  697 F.3d 964 (9th Cir. 2012) ...........................................................................23

*U.S. v. Sivilla*
  714 F.3d 1168 (9th Cir. 2013) .........................................................................24

*United States v. Barrera-Moreno*
  951 F.2d 1089 (9th Cir.1991) ..........................................................................19

*United States v. Doe*
  125 F.3d 1249 (9th Cir.1997) ..........................................................................19

*United States v. Grammatikos*
  633 F.2d 1013 (2nd Cir. 1980) ........................................................................25

*United States v. Leung*
  351F.Supp.2d 992 (C.D.Cal.2005) .................................................................20

*United States v. Little*
  753 F.2d 1420 (9th Cir.1984) ..........................................................................19

*United States v. Lopez*
  4 F.3d 1455 (9th Cir.1993) ..............................................................................20

*United States v. Peter Kiewitt Sons Co.*
  655 F.Supp. 73 (D.Colo.1986) ........................................................................20

*United States v. Remington*
  191 F.2d 246 (2nd Cir. 1951) ..........................................................................26

*United States v. Tsutagawa*
  500 F.2d 420 (9th Cir.1974) ............................................................................20

*United States v. Vavages*
  151 F.3d 1185 (9th Cir.1998) ..........................................................................19

*United States v. Woodley*
  9 F.3d 774 (9th Cir.1993) ................................................................................20

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

3

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

*Washington v. Texas*
  388 U.S. 14, S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) ...................................................19

**Statutes**

18 U.S.C. § 371 ...................................................................................................................5
18 U.S.C. § 1503 .................................................................................................................5
18 U.S.C. § 1519 .................................................................................................................5
33 U.S.C. § 1901 .................................................................................................................5
33 U.S.C. § 1908 .................................................................................................................5

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

4

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

**MEMORANDUM OF POINTS AND AUTHORITES**

## I. THE GOVERNMENT'S DETERMINATION OF WHICH WITNESSES THE DEFENDANTS CAN PRESENT TO THE JURY PREVENTS THE COURT FROM CONDUCTING A FAIR TRIAL.

### A. Background.

The M/V CMA CGM AMAZON was detained by the United States Coast Guard on or about January 11, 2019, as the government investigated alleged violations of APPS, 33 U.S.C. § 1901, *et seq*. At the request of the Coast Guard, the Customs and Border Protection Agency withheld the vessel's departure clearance unless and until "surety satisfactory to the secretary" was posted pursuant to 33 U.S.C. § 1908(e). The so-called "Agreement on Security" imposed on Capital (and the Vessel's owner Dias Container Carrier S.A.) by the U.S. Coast Guard was signed on January 24, 2019. A copy of the Agreement on Security is attached as **Exhibit "A"** to Greenberg Decl.

Among other onerous terms, the government demanded that ten (10) crewmembers be forced from their shipboard homes and be detained in the Central District of California at the pleasure of the government. The Agreement on Security requires Capital (and the Vessel's owner) to, inter alia, pay for housing, transportation, total wages (including contractually allowable overtime), medical insurance, and at least an additional $35.00 per day for food for each crewmember until the government says otherwise. *Id*., at pp.6.

Four crewmembers, Master Madalin Butoi, Third Engineer Metin Acai, Electrical Engineer George Cadar, and Fitter Stefan Bunda were permitted by the government to depart the jurisdiction at the beginning of March.  Thereafter, on June 13, 2019, an Indictment was returned against Defendants charging the alleged violation of the Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a) ("APPS"), three counts of Obstruction of Justice pursuant to 18 U.S.C. § 1503, § 1512(b)(3), and § 1519, and Conspiracy pursuant to 18 U.S.C. § 371. *See* Doc. 41. The government has not provided any explanation why it took six months to return an indictment.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1451878.1

Six crew members, including Mr. Luca, have been functionally detained in the district for eight (8) months. All of these seafarers are foreign nationals and if/when they were to depart the United States would be beyond the subpoena power of this Court.

It is undisputed that once crew members from the AMAZON return to Romania they are beyond the Jurisdictional Authority of the United States District Court. It for this very reason that the Government detained the crew members in a hotel room for six months while the Government prepared its Indictment.

**B.     The Court Had To Intervene To Preserve The Testimony of Second Engineer, Mr. Gavriluta-Strat, Before His Return To Romania, Over The Objection Of The Government.**

Mr. Gavriluta-Strat was interviewed twice by the Coast Guard investigators onboard the AMAZON and has also met at least two (2) additional times with the government prosecutors and special agents handling these cases. Critically, during his shipboard interviews, Mr. Gavriluta-Strat repeatedly, in tape recorded interviews, declined to inculpate Chief Engineer Luca, despite the Coast Guard agents repeatedly threatening him with being a subject of the investigation if he did not tell them what they wanted to hear. Even when he was told he would not see his children for more than a year if he doesn't inculpate the Chief Engineer but that the Coast Guard would arrange for daily video conferences with his children if he inculpates the Chief Engineer - Mr. Gavriluta-Strat would not buy-in to the Coast Guard's story.[1]

_____

[1] "Is that what your wife would want you to do? Do you think your kids want you to take the blame for everything.  Is seeing your kids soon as you can more important. Isn't getting home and playing with your kids more important than what the chief engineer thinks about you? . . . In this hand right here is that you're going to have to stand on your own because you will have to stay in California. If this gets accepted, you will have to stay. But in this hand, you have to stand here, by yourself, on your own, without any help, without any guarantees at all. In this hand, you get my help. You get the government's help. You get the guarantee that you get to call your wife every day, that you get to talk and FaceTime with your kids every day, which is more than you can do from here. No matter what, you have to stay here if this goes the distance, no matter what. That's not changing. Please, point which hand you would like. Please, point to

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

1451878.1

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

Thereafter, during a March 27, 2019 interview session at the U.S. Attorney's Office, Mr. Gavriluta-Strat stated that "he does not recall the Chief Engineer giving orders to the Fourth Engineer to make these transfers" from the bilge wells to the Clean Drain Tank and that he did not tell the Chief Engineer (or Master) about the transfers. In addition, Mr. Gavriluta-Strat confirmed that he did not tell the Captain or Capital what was happening onboard because he "did not want to get involved in the matter." When pressed by the government to inculpate Chief Engineer Luca for the alleged failure to obtain and complete an enclosed space permit for work that was being done in the duct keel, Mr. Gavriluta-Strut affirmed that he failed to do what was necessary to obtain the permit, despite reminders from Chief Engineer Luca to do so.

As the Court will recall, the government sought to prevent the Rule 15 Deposition of Mr. Gavriluta-Strat, the Second Engineer, prior to his return to Romania. (See: Dkt. 63.) The government recognized that Mr. Gavriluta-Strat's testimony would contract the testimony of the government's witnesses in that he would not place any blame or knowledge of misconduct on the shoulders of Mr. Luca, the Chief Engineer. Worse yet, even when Mr. Gavriluta-Strat was intermittently offering personal and prosecutorial benefits if Mr. Gavriluta-Strat he would just blame the Chief Engineer. Even under the pressure of the good-cop / bad-cop game, Mr. Gavriluta-Strat did not agree that the Chief Engineer was aware of what the 4th Engineer as doing with the bilge water.

The danger posed when law enforcement officers lie to a witness in an interview is that it back-fires and renders a result that is exculpatory. Here, when Mr. Gavriluta-Strat was being told, during an interview on the ship, that he was choosing between: (1) not talking to four-year old and one year old daughters for as long as a year; or, (2) seeing his daughters on video conferences every day; he still would not agree with Agent Margelot's

which hand you would like." Mr. Gavriluta-Strat still would not agree with the Coast Guard's effort to blame the Chief Engineer. (Excerpt from January 12, 2019 interview by Lt. Phillips and Agent Margelot.)

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

contentions that the Chief Engineer directed the 4th Engineer to pump water from the bilge to the clean drain tank.

Despite the shocking tactics and extraordinary effort of Agent Margelot, on the ship to get Mr. Gavriluta-Strat to go along with Agent Margelot's story, Mr. Gavriluta-Strat the government insisted that his testimony is not exculpatory.  (Dkt. 63, p. 15 "The Testimony of Gavriluta-Strat Is Not Exculpatory".)  A refusal to blame the Chief Engineer, and refusal to say that the Chief Engineer directed the conduct or even knew of it is by definition exculpatory.  For obvious reasons, the government would prefer that the jury never hear the tape recorded interview. (See: Judge Walsh's comments on this point.) Consistent with the desire to prevent the jury from hearing from Mr. Gavriluta-Strat, the government declined to extend use-immunity to Mr. Gavriluta-Strat for his trial testimony/Rule 15 deposition testimony. *Id.*

The Court will recall, the Court overruled the government's objection and ordered the Rule 15 Deposition of Mr. Gavriluta-Strat.[2]  The government refused to grant Mr. Gavriluta-Strat use-immunity and the Court was disinclined to overrule the government's refusal to allow a full and open deposition. The Honorable Patrick Walsh, Magistrate Judge, was selected to oversee the deposition of Mr. Gavriluta-Strat.

After reviewing the papers submitted by the parties Judge Walsh harshly queried the government as to why it was trying to thwart Mr. Gavriluta-Strat's testimony:

> The Court: There is an argument to be made based on the Government's reasoning. That because the Justice Department is not a party to that proffer, it's more than that. It is a waiver of the

[2] In the view of the Ninth Circuit the denial of a motion for Rule 15 depositions "*may impinge on a defendant's Sixth Amendment right to a fair trial*.") (emphasis added).  Of course, the same is true for a Rule 15 deposition taken by counsel that was not provided complete discovery, including *Jenks* Materials, or counsel that was not provided sufficient time to review the Discovery Materials and prepare for the deposition.  *See People of the Territory of Guam v. Ngirangas*, 806 F.2d 895, 897 (9th Cir. 1986).

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1451878.1

fifth amendment, because there's nothing that prevents the Justice Department from coming in and prosecuting the defendant based on his statements. They were not part of the proffer agreement. **So there's an argument to me that he waived his fifth amendment rights by talking to the Government, thinking that he was protected but, in fact, he wasn't protected, because the Government's position today is the Justice Department and the U.S. Attorney's office are separate entities, and unless they both agree to something, there is no protection.**

And I do understand that argument; but ultimately, I -- I think that I'm going to side with the Government and the witness' counsel in this case. And I find that he -- I plan to find that he is subject to jeopardy if he does testify about what he said in the proffer, despite the Government's contorted kind of tortured explanation about how their separate from the Justice Department when it comes to the plea agreement. And I think what I expect they would say differently about the proffer -- but I want to hear from Mr. Greenberg first -- and you tell me what you think. What I plan to do is allow questioning about the plea agreement, the factual basis of the plea agreement and the -- the interrogations or the interviews by the Government agents and anything that does not impose upon his fifth amendment privileges. Come up to the lectern, will you please, Mr. Greenberg.

MR. GREENBERG: Your Honor, we just received this morning from the Government a copy of the transcript from the change of plea hearing in which the Court did notify the defendant that he had constitutional rights, the right to remain silent and that he would be waiving that right. We then have the plea agreement where he, again, waives the right. And then we have the proffer agreement. And as we pointed out in our papers, the second page of that at subsection B, says that the Government, but there's -- it certainly would be incredibly unfair if only the Government gets to do this: "Used statements made by you or your client at the meeting and all evidence obtained directly or indirectly from those statements for the purpose of cross-examination, should your client testify. He is testifying. This is trial testimony. And it certainly can't be that only

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

9

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

the Government gets to use those statements. That would be incredibly unfair.

THE COURT: **I think it's incredibly unfair, but I do think that's the rule. I agree with you. I notice the same problem that they basically have locked this witness in to -- solely for their use, and you can't use him, and -- and we're all aware of that. And I -- and you do think it's unfair. I would agree with you. It's not ultimately going to be my decision. It will be Judge Phillips,** but I -- you'll agree with me that he has -- but if he testifies about a crime right now, they can prosecute him for it and so can the Justice Department.

(See: full text of Judge Walsh's colloquy with the government at **Exhibit "B"** to Greenberg Decl.)

Judge Walsh queried AUSA Paul Stern regarding the Queen for a Day letter. Judge Walsh commented that the agreement is illusory in that the government is now saying that while the proffered information cannot be used by prosecutors in the Central District of California, it can be sent to the Department of Justice and DOJ can file charges based on the proffer. Judge Walsh questioned why any defense attorney would ever sign the document if it meaning is as described by the government in this particular case.

Mr. Greenberg raised the point that Judge Phillips declined to order use-immunity to Mr. Gavrituta-Strat because Defendants had not presented evidence of misconduct or manipulation by the prosecution.

MR. GREENBERG: On the record she [Judge Collins] said I've not [seen] any [] misconduct by the Government that would justify this at this time I think this whole colloquy is what she was looking for but I can't represent that.

*Id.*

Judge Walsh appreciated that logistical bind that Defendants found themselves at that time, i.e., unable to cross-examine Mr. Gavriluta-Strat regarding the contents of his

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

proffer interview, solely because the government was still threatening that he could be prosecuted again by DOJ. Judge Walsh, again, suggested that we address the issue with Judge Phillips:

> THE COURT: I understand. You know, if you [] ask her I'm sure she'll read the transcript yes, sir.

*Id.*

The government failed to relent and continued its refusal to grant Mr. Gavrilua-Strat use immunity and continued to insist that he could get prosecuted by DOJ for his statements during the proffer session. The government's tactics, albeit disliked by Judge Walsh, effectively removed the information from the proffer session from the Rule 15 Deposition. Meanwhile, the prosecutors read the entire factual statement in Mr. Gavriluta-Strat's plea agreement (drafted by the prosecutors) into the record and asked Mr. Gavriluta-Strat if he "agreed" with the statement.

Mr. Gavriluta-Stat is not the only witness the government has endeavored to limit the Defendants' ability to present exculpatory evidence to the jury. The Government also released Mr. George Cadar, the ship's Electrical Engineer and Mr. Stefan Bunda, the ship's Fitter, both of whom worked in the Engine Room of the AMAZON and provide the government with exculpatory information.

## C. Mihai George Cadar, the Ship's Electrical Engineer, Was Released To Return to Romania After He Provided Exculpatory Information To The Government.

Electrical Engineer Mihai George Cadar, was removed from the ship at the demand of the Coast Guard, as set forth in the Coast Guard's Security Agreement. The government waited two months to interview Mr. Cadar. On March 1, 2019, Mr. Cadar was interviewed by SA Margelot, SA Venable AUSA Heather Gorman, AUSA Paul Stern and AUSA Eric Silber. The interview was conducted pursuant to the U.S. Attorney's Office Proffer Letter. Counsel for Defendants were not invited to attend the interview. The Coast Guard's

11

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1451878.1

Report of the interview was entered into the Coast Guard's computer on March 4, 2019. The Interview Report for Mr. Cadar was not provided to counsel for Defendants until after the Coast Guard released Mr. Cadar to return to Romania.

During the March 1, 2019, interview Mr. Cadar conveyed information that directly contradicts the government's theory of the case and impeaches several of the government's witnesses.

- He worked in a shipyard for 6 years prior to becoming a seafarer in 2011. He has been with Capital Shipping since 2013. He has sailed on the following vessels: MAGDALENA, AGAMEMNON, ARCHIMIDIS, HYUNDAI PRESTIGE, AND HYUNDAI PLATINUM.

- He has worked with the following before: Master Butoi (4 times), Chief Engineer Luca (3 times), 2nd Engineer Gavriluta-Strat (3 times), 3rd Engineer Acai (2 times), and Reeferman Bulearca (1 time). He stated he had a good working relationship with everyone. He has been on CMA CGM AMAZON once before from January to March 2018. He boarded AMAZON for this latest voyage in Halifax, Canada on November 4, 2018. AMAZON then went to New York, Savannah, Charleston, Asia, Suez Canal, and to South Africa.

- His duties onboard AMAZON is to maintain and repair electrical and electronics. His normal workday was from 0800 to 1700 hours each day and be the on call electrician. He received his electrical training from high school and the Marine Academy. He received training in the engine room from his on-the-job training for 8 years.

- He receives his jobs from the PMS program and has to read and sign a job briefing before work commenced. When the work is completed the Chief Engineer closes the job in the system. He reports directly to the Chief Engineer and the Chief Engineer is the only one to give or assign orders to him.

- The morning meetings were attended by the Chief Engineer (C/E), 2nd Engineer (2/E), 3rd Engineer (3/E), Fitter, 4th Engineer (4/E), the 3 Oilers, and himself. He stated C/E did not attend every morning meeting. **The meetings were led by 2/E and job assignments were arranged and assigned by 2/E.**

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

1451878.1

- **The room where the morning meetings were held was large in size, but the Romanian and Filipino crew were on opposite sides of the room. The Romanian crew was briefed about their assignments in Romanian and the Filipino crew was briefed about their assignments in English.**

- He is aware of the location of the duct keel. He recalls changing a ballast sensor at the end of November 2018 in that space. He does not recall seeing any oil in the space while he was in the space. The work he needed to complete was on the starboard side. He recalls seeing 2/E, Fitter, and the Filipino crew working in the duct keel space. The ballast sensor he replaced was on the starboard side and the Filipino crew was working on the port side.

- He heard about a fuel leak in the duct keel caused by a problem with the coupling gaskets. He said the ship had to be ballasted to empty the fuel line to change the gaskets.

- **He is aware of the location of the clean drain tank. The tank is used to collect condensation from the chargers, air conditioning, and air cooler on the engines.**

- **He has not heard of anyone transferring liquid from the bilge well to the clean drain tank. He has not seen or heard about hoses, pumps, or a portable air pump in the engine room.**

- **He has not heard of anyone pumping bilge water overboard.**

- He is aware of the pump and Oil Content Meter for the clean drain tank system. He has not completed any work on this system. **He has not seen the pump in operation or manipulated in any way. He has not seen any bottles of water or mineral water near the system.**

- He did not hear anything about destroying, manipulating, hiding, or tampering with any equipment onboard. He said that would not be normal. He stated if a piece of equipment was not working properly he would help fix it, not hide it.

(**Exhibit "C"** to Greenberg Decl.)

Assuming that Mr. Cadar would testify in a manner consistent with the statements he made during his interview on March 1, 2019, Mr. Cadar would contract and impeach

13

1451878.1

the government's witnesses in several respects.  Contrary to the whistleblower's assertion that everyone in the morning meetings heard the Chief Engineer instruct the 4th Engineer to transfer bilge water from the bilge tank to the clean drain tank, Mr. Cadar never heard such an instruction and he attended all of the morning meetings. If Mr. Cadar also impeaches the 4th Engineer's claim that the hose he used to transfer bilge water to the clean drain tank was seen by everyone that worked in the engine room and that therefore, Chief Engineer Luca must have seen it.  Mr. Cadar would testify that he never saw the hose arrangement depicted in the photographs taken by the whistleblower. Moreover, he has never seen anyone manipulate the oil content meter.  While the 4th Engineer denies that he ever tricked the Oil Content Meter to the clean drain tank, it is the government theory that he in fact did trick it on a regular basis. (The reason for the internal conflict between the 4th Engineer and the government on this topic is that the government wants to claim that the water in the clean drain tank was a "pollutant" and they cannot make that argument if the water passed through an oil content meter without issue.)

Mr. Cadar's credibility with the jury would have been well established based on his extensive experience on ships and experience working with several of the crew members, including Chief Engineer Luca, Second Engineer Gavriluta-Strat and Third Engineer Acai.  He was trained at the Marine Academy and has eight years of on-the-job-training. However, because the Government concluded that Mr. Cadar's testimony would not comport with the story told by the government's whistleblower - Mr. Cadar was released to leave the jurisdiction of the United States and return home to Romania, which he has done.

### D. Stefan Bunda, the Ship's Fitter, Was Released To Return to Romania After He Provided Exculpatory Information To The Government.

The ship's Fitter, Stefan Bunda, was removed from the ship at the demand of the Coast Guard, as set forth in the Coast Guard's Security Agreement.  The government waited two months to interview Mr. Bunda. On March 1, 2019, Mr. Bunda was

14

1451878.1

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

interviewed by SA Margelot, SA Venable AUSA Heather Gorman, AUSA Paul Stern and AUSA Eric Silber. The interview was conducted pursuant to the U.S. Attorney's Office Proffer Letter. Counsel for Defendants were not invited to attend the interview. The Coast Guard's Report of the interview was entered into the Coast Guard's computer on March 4, 2019. The Interview Report for Mr. Bunda was not provided to counsel for Defendants until after the Coast Guard released Mr. Bunda to return to Romania.

During his March 1, 2019 interview Mr. Bunda conveyed information that directly contradicts the government's theory of the case and impeaches several of the government's witnesses:

- Mr. Bunda is from Romania. He has been in the shipping industry since 1997. He started work in a shipyard in Romania as a welder. His duties includes welding, making pieces on the boat, and using a lathe.

- He boarded CMA CGM AMAZON in Singapore on September 27, 2018. This latest voyage is his second tour on AMAZON. The first time was in 2017. He recalls the route taken after boarding the vessel was through Vietnam, China, and then Los Angeles. He does not recall all the ports visited after boarding the vessel.

- He has worked with Master Butoi and 3rd Engineer Acai one time before. He has not worked with the 4th Engineer or the oilers before. He worked for the previous Chief Engineer (C/E) Surla and the previous 2nd Engineer (2/E) during this voyage.

- He stated he got along well with his fellow co-workers and did not have any problems.

- He reports directly to the 2/E who gives him his job assignments daily.

- He stated there is a morning meeting in the engine control room with C/E and 2/E where job assignments are assigned each day. He stated the Romanian and Filipino crew are separated during the morning meetings with the Romanian crew on one side and the Filipino on the other.

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

---

15

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

- He stated he receives his orders from 2/E and then goes to his workshop, which is located on the same level as the engine control room. There are times 2/E comes to his workshop and gives him his assignments.

- He has not heard C/E giving 2/E instructions about work to be completed in the engine room.

- He returned to the duct keel area in January and saw "very little" accumulation of oil on the floor. He stated C/E and 2/E spoke about fixing the leak beforehand.

- He went to the duct keel to tightened the screws to reduce the leakage with 2/E. He noticed the gaskets were compromised and could not be changed because of fuel in the pipes, bad weather, and the boat moving.

- He stated tightening the screw was a temporary fix to the pipe. It would be a bigger job to make a permanent fix to the pipe. He stated he was part of the team that fixed the pipe in Los Angeles and the gaskets were changed. He assisted the 2/E to change the gaskets.

- **He is not aware of any transfers of bilge water between the bilge well and the clean drain tank. He heard about the transfers after the Coast Guard inspection, not before.** He was not privy to the information regarding transfers. 2/E did not ask him to help conduct any transfers.

- **He did not see or hear about any hoses or pumps in the engine room.**

- He heard of the transfers between the bilge well to the clean drain tank after the vessel was inspected by Coast Guard in Los Angeles. He recalls the C/E speaking with the crew in the control room about the discovery of the transfers by the Coast Guard. The C/E was not aware of any transfers and said it must have been an oiler. He stated **the C/E was upset and surprised because it happened**. He stated 2/E was in the meeting but does not remember if anyone else was present.

- He is not aware of any oily water being discharged overboard. He is aware that discharge of oily water overboard is illegal and has received training on it. He stated oily water being discharged overboard must go through the Oily Water Separator (OWS) beforehand.

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

- He stated there is a passdown log that is handed off to each fitter. 2/E is responsible for informing the company of the jobs the fitter completes by writing the work down in a notebook, and entering the information in the computer at the end of the month.

- He did not hear anything about destroying, manipulating, hiding, or tampering with any equipment onboard.

- He stated no one threatened him or told him what to say to the Coast Guard. No one made him feel uncomfortable for speaking with the Coast Guard. He did not see or hear any conversations addressing the crew about what to say to the Coast Guard.

(See: **Exhibit "D"** to Greenberg Decl.)

Mr. Bunda, like Mr. Cader, attended all of the morning meetings in the Engine Control Room. He received his instructions from the Second Engineer during the morning meetings, not the Chief Engineer as alleged by the whistleblower. Mr. Bunda never heard the Chief Engineer give an instruction to transfer bilge water to the Clean Drain Tank. The 4th Engineer and Oiler Lopez will testify that everyone in the morning meeting would have heard the Chief Engineer give such an instruction. (*See:* Greenberg Decl. ⁋ 11.). However, Mr. Cader and Mr. Bunda never heard these instructions.[3] Moreover, the whistleblower claims that everyone in engine room would have seen the hose. Yet, Mr. Cadar and Mr. Bunda never observed the hose and pump arrangement that the whistleblower claims must have been observed by the Chief Engineer because it was open and obvious to everyone that worked in the engine room.

Mr. Bunda told the government that he, Mr. Bunda, only learned about transfers with a hose from the bilge wells after the Coast Guard was on board the vessel. Mr. Bunda told the government that worked regularly in the engine room and he never saw a hose and pump arrangement in the Engine Room.

---

[3] Mr. Debil's goal was disclosed to the Coast Guard – he stated "he knew about receiving a reward if there was a successful prosecution before entering Los Angeles. He stated Oiler Teodoro Lopez [aka the whistleblower] told him about the reward."

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

Tucker Ellis llp

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Mr. Bunda's statements to the Coast Guard and the U.S. Attorneys also provided a revealing description of the Mr. Luca's response when Mr. Luca learned of the transfers from the bilge well to the clean drain tank – he was <u>surprised</u> to learn that such transfer had taken place. The government did not probe this information further, or for that matter, any of Mr. Bunda's other exculpatory statements.

## II.   THE GOVERNMENT'S EFFORTS TO IMPACT WHICH WITNESSES THE DEFENDANTS CAN PRESENT TO THE JURY WARRANTS DISMISSAL OF THE INDICTMENT.

The Constitution allows prosecutors to select the witnesses to be heard by the Grand Jury. No defense witnesses are required and no cross-examination is permitted. The government has endeavored to make the trial in this case quite similar – only government witnesses and no defense witnesses.

On March 1, 2019, the Coast Guard agents and three members of the U.S. Attorney's Office were present when the exculpatory statements were made by Mr. Bunda and Mr. Cadar. The fact that the testimony was exculpatory had to be an inescapable conclusion to anyone that attended the interviews.  Mr. Bunda and Mr. Cadar were not invited to testify before the grand jury.  Instead, they were sent home shortly after their interview and they are now beyond the reach of Defendant Luca or this Court.

The right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights. This Court had occasion in *In re Oliver,* 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948), to describe what it regarded as the most basic ingredients of due process of law.... "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right

18

is a fundamental element of due process of law." *Washington v. Texas,* 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

In *United States v. Little,* 753 F.2d 1420 (9th Cir.1984), the Court cited a line of cases "which support the proposition that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *Id.* at 1438; *see also United States v. Vavages,* 151 F.3d 1185, 1188 (9th Cir.1998) ("It is well established that 'substantial government interference with a defense witness' free and unhampered choice to testify amounts to a violation of due process.").

"The district court may dismiss an information based on outrageous government conduct if the conduct amounts to a due process violation." *United States v. Doe,* 125 F.3d 1249, 1253 (9th Cir.1997) (quoting *United States v. Barrera-Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991)). Even if the conduct does not amount to a due process violation, a court may nonetheless dismiss charges "under its supervisory powers. The court may exercise its supervisory powers 'to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations...; or to deter future illegal conduct.'" *Id.* at 1253 (citations omitted).

Here, the government has systematically undertaken to structure the Defendants' evidence and witnesses. Defendants were unfairly restricted in obtaining exculpatory testimony from Mr. Gavriluta-Strat.  Judge Walsh acknowledged what the government was doing was "*incredibly unfair*". That conclusion was reached without Judge Walsh even knowing about the removal of two exculpatory witnesses, Mr. Cadar and Mr. Bunda.

Several cases, including some from the Ninth Circuit, have recognized the general principle that prosecutors cannot interfere with defense access to witnesses. *See, e.g., Vavages, supra,* 151 F.3d 1185, 1190–91 (government cannot discourage defense witnesses from testifying); *Kines v. Butterworth,* 669 F.2d 6, 9 (1st Cir.1981) (habeas corpus) ("when the free choice of a potential witness to talk to defense counsel is constrained by the prosecution without justification, this constitutes improper interference

1451878.1

with a defendant's right of access to the witness"); *United States v. Tsutagawa,* 500 F.2d 420, 423 (9th Cir.1974) (government pretrial deportation of witnesses) ("[a] defendant has the right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses[."); *United States v. Leung, 351F.Supp.2d 992 (C.D.Cal.2005)* (dismissing indictment because plea agreement barred cooperating defendant from meeting with co-defendant); *United States v. Peter Kiewitt Sons Co.,* 655 F.Supp. 73, 77–78 (D.Colo.1986) (improper for prosecutor to discourage witnesses from talking to defense counsel); *United States v. Lopez,* 4 F.3d 1455, 1463-64 (9th Cir.1993); *United States v. Woodley,* 9 F.3d 774, 777 (9th Cir.1993). Whatever else may be argued about the government's conduct here, it cannot be argued that what has occurred with respect to Mr. Gavriluta-Strat, Mr. Cadar and Mr. Bunda was not deliberate.  The government endeavored to interfere with Defendant Luca's ability to present evidence to the trial jury and that effort along should not be overlooked or countenanced by the Court.

The interview of Mr. Cadar and Mr. Bunda occurred at the U.S. Attorney's Office on March 1, 2019 and the Reports of Interview was finalized on March 4, 2019.  (See: **Exhibit "C"** and "**D"** to Greenberg Decl**.** Another witness with critical and exculpatory information is the Master from the AMAZON, Madalin Butoi.  Mr. Butoi was also release to go home to Romania on March 15, 2019.  His interview was conducted with the U.S. Attorney's Office on March 1, 2019.  The Interview Report was finalized on March 5, 2019. (See: **Exhibit "F"** to Greenberg Decl.)**.**

On March 4, 2019, Mr. Chalos, counsel for Capital Ship Management asked for the interview reports of Mr. Bunda and Mr. Cadar before they would transported home.  The email was copies to all of the prosecutors on the case as well as Tyler Stutin at the Coast Guard.  On March 5, 2019, AUSA Erik Silber told Mr. Chalos that "the interviews took place on Friday, we do not have the reports of the interview at that is point . . ."  Mr. Stutin at the Coast Guard was copied on AUSA Silber's responsive email.  Yet, no one let Mr. Chalos know that the Reports were finalized on March 4, 2019 at 19:30, approximately

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

1451878.1

24 hours prior to the representation that the Reports did not exist.  (See: **Exhibit "E"** to Greenberg Decl.)

Counsel for Mr. Luca was not copied on the exchange with the AUSA Silber, perhaps because the discussion concerned the removal of former employees of Capital Ship Management and the exculpatory nature of their statements on March 1, 2019, had not been disclosed.  It appears that the purpose of the email was simply to repatriate the crew members as soon as possible.  Only the government knew how exculpatory their testimony at trial would be if there were required to stay in the United States.

Thereafter, on May 26, 2019 when the U.S. Attorney's Office provided Defendants with pre-indictment discovery materials, the Interview Reports of Mr. Cadar and Mr. Bundar were not disclosed. The purpose was to allow Defendants counsel to review the evidence and likely testimony to be able to evaluate the government's proposed plea offer. The discovery materials included:

> a. Interview reports from the interviews of : oiler Lopez (2/19/2019), oiler Valasco (2/19/2019), oiler Suzio (2/22/2019), 2nd Engineer Gavriluta-Strat (3/25/2019); 4th Engineer Debil (2/19/2019 and 5/16/2019);
>
> b. a summary forensic report;
>
> c. a summary analysis of the Oil Record Book;
>
> d. copies of the Oil Record Book;
>
> e. various photographs; and,
>
> f. various reports of investigation.

(See: Greenberg Decl. ¶ 9.)

Conspicuously absent from the government's discovery, at that time, was the interview report of Mr. Bunda or Mr. Cader. It is difficult to imagine that this was unintentional given that they Mr. Bunda and Mr. Cader were interviewed more than two months before the discovery was provided.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

---

21

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

In this case the Reports of Interview of Mr. Cadar and Mr. Bunda were completed and available to the prosecutors for two weeks prior to their departure from the United States. Even if only Mr. Stutin at the Coast Guard knew that the reports were already completed at the time of the email to Mr. Chalos on March 5, 2019, Mr. Stutin should have said so. Moreover, because the prosecutors personally participated in the interviews of Mr. Cadar and Mr. Bunda they knew that they were exculpatory witnesses as of March 1, 2019. There simply is no justification why Mr. Luca's counsel was not provided an opportunity to obtain a Court order for a Rule 15 Deposition of the witnesses being released by the government.

## III.   IN THE ALTERNATIVE, THE GOVERNMENT'S DETERMINATION OF WHICH WITNESSES THE DEFENDANTS CAN PRESENT TO THE JURY WARRANTS AN ADVERSE JURY INSTRUCTION.

The government's duty to make disclosures of exculpatory information must be carried-out in a manner to that allows the information to be presented to the jury.  Here, the exculpatory testimony of Mr. Cadar and Mr. Bunda was selectively excluded from the jury's consideration by the government's failure to provide timely notice to Defendants' counsel that would have allowed for a Rule 15 deposition.

The removal of the exculpatory and credible witnesses from the jurisdiction of this Court was not an accident.  The March 1, 2019 interviewers were conducted by Coast Guard and the prosecutors, in the United States Attorney's Office. And while Mr. Cadar and Mr. Bunda were not whisked away in the dead of night, they might have well have been given that no notice was given by the government to counsel for Mr. Luca.  Had the government informed defendants' counsel that these witnesses' testimony would be contrary to the government's theory of the case counsel for Mr. Luca could have attempted to obtain a Rule 15 Deposition of Mr. Cadar and preserved his exculpatory testimony. Because no notice was provided and the interview report was not disclosed until after these witnesses left the United States the government quite effectively

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

22

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISDICTION OF THE COURT

1451878.1

prevented the jury from: (1) hearing from Mr. Cadar or Mr. Bunda; (2) comparing their testimony to that of the government's selected witnesses; and, (4) making a determination of their respective credibility.

It is evident from the heavy-handed interview of the Second Engineer, Mr. Garviuat – that took place on the ship, the interview of quick release of Mr. Cadar, and the interview and quick release of Mr. Bunda, that the government was not investigating the allegation of a whistleblower, but rather it was building a case based on one particular story. Any information that contradicted that story was disregarded as false and the witness was released to leave the country. While such a myopic investigative technique can lead to false results, particularly when dealing with witnesses from foreign cultures, this approach is precisely why convictions must be based on a trial, not merely the decision of an investigator, prosecutor or the Grand Jury.

Once the government had information suggesting that the Mr. Cadar and Mr. Bunda had exculpatory information, they should not have released them without first giving defense counsel a chance to interview them and seek a Rule 15 Deposition. *See U.S. v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012). Where the government releases "a witness who it knows would testify favorably for the defense, the defendant is entitled to have the jury informed." *Id.* at 975.

The requirements for a missing-witness instruction were expressed in *U.S. v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012). "First, the party seeking the instruction must show that the witness is peculiarly within the power of the other party. Second, under the circumstances, an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Id.* at 975 (internal quotations omitted). There, because the witness was an alien lacking a lawful immigration status, the federal government alone had authority to parole her into the country to testify. Moreover, the second requirement was easily satisfied because the witness had told agents information that would be exculpatory for defendant and was likely to repeat the same information at trial.

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Here, the requirements for a missing-witness instruction are similarly satisfied. Both Mr. Bunda and Mr. Cadar are Romanian nationals and like the witness in *Leal-Del Carmen*, only the federal government can parole them into the country to testify. Moreover, both witnesses offered exculpatory information when questioned by Coast Guard agents, mainly that they had not heard Chief Engineer Luca give instructions to transfer bilge water to the clean drain tank.

Similarly, in *U.S. v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993) the court reversed the conviction of two defendants after the government sent back a witness before defense counsel had the chance to interview him. There, the defendants had a conversation in Armenian while selling drugs to an agent. *Id.* at 1317. Only the witness knew what was said because the agent did not speak Armenian. The government lied about entering into a plea deal with the witness before allowing him to leave the United States. *Id.* at 1317. The court noted that it was permissible to infer that "when the government can call a key percipient witness, but relies instead on out-of-court statements and on testimony by an agent who didn't understand half the critical conversation, a jury could conclude that the witness's testimony, if produced, would [have been] unfavorable to the prosecution." *Id.* at 1317.

The standard for remedial jury instructions is considerably less than that required for dismissal.  In *U.S. v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) the court noted that bad faith was not the appropriate standard. Instead, "courts must balance the quality of the Government's conduct against the degree of prejudice to the accused, where the government bears the burden of justifying its conduct and the accused of demonstrating prejudice." There, the government sold the defendant's jeep which contained a secret compartment filled with drugs. The defense had planned on having the Jeep inspected as part of their blind mule theory. However, once the Jeep was sold, the defense was left with nothing but photographs which were not adequate to mounting their defense. Thus, the court determined that the government was negligent in "failing to adhere to reasonable

1451878.1

standards of care in its prosecutorial functions" and that the substitute evidence was not adequate. *Id.* at 1173. Thus the prejudice to the defendant was significant and the case was remanded to the district court with instructions to grant the defendant a remedial jury instruction.

Here, the situation is far worse, the government selectively released witnesses that were obviously exculpatory, Mr. Bunda and Mr. Cadar, before defense counsel had a chance to preserve their testimony in a Rule 15 Deposition. The government attempted to do the same with Mr. Garviluta-Strat and would have been successful but-for the Court's order of the Rule 15 deposition of Mr. Gavriluta-Strat before he could return to Romania.[4]

Defendant Luca requests that the Court should instruct the jury that:

> There are two witnesses, Mr. Bunda and Mr. Cadar, that were released by the government to return to Romania after they had were interviewed on March 1, 2019. Because they were released to return home before a deposition could be taken by Defendant Luca. Portions of their statements to the Coast Guard and the U.S. Attorney's Office will be read to you by counsel for the Defendants. This information would normally be excluded as hearsay because it is a statement that was made outside of this court and law favors live testimony from witnesses in the Courtroom. The jury should assume that their testimony would have been credible and adverse to the government's allegations.[5] Defendants' counsel should be permitted to read to the jury the bullet points listed above.

---

[4] Court have held that bad faith can exist simply "where discoverable material is destroyed [take away from defendants] by law enforcement agents at the conclusion of a fruitful investigation, knowing that an indictment and trial is looming." *United States v. Grammatikos* (633 F.2d 1013, 1021 (2nd Cir. 1980). For Due Process purposes, the evidence in question need not be materially exculpatory. Instead, it only needs to be "potentially useful" evidence to the defense. *Illinois v. Fisher*, 540 U.S. 544 (2004). Here, the evidence is more than just useful, it is direct, exculpatory testimony of two credible witnesses.

[5] "Evidence of efforts to suppress testimony or evidence in any form like the spoliation of documents is affirmative evidence of the weakness of the prosecution's case." *United*

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1451878.1

## IV.    CONCLUSION

WHEREFORE, Defendants respectfully request that the Court find that the government's conduct in this case rises to the level of a deliberate due process violation; and therefor the Indictment should be dismissed and Defendant Luca immediately released to return home.

In the alternative, if the Court concludes the government's conduct is not sufficient to justify dismissal, an adverse jury instruction should be given and Defendants' counsel should be permitted to read selected segments of statements made by Mr. Cadar and Bunda to the Coast Guard and the U.S. Attorney's Office on March 1, 2019.

DATED:  August 12, 2019                    Tucker Ellis LLP


By:    */s/ Marc R. Greenberg*
       Marc R. Greenberg
       marc.greenberg@tuckerellis.com
       Attorneys for Defendant Ioan Luca

*States v. Remington*, 191 F.2d 246, 251 (2nd Cir. 1951), cert denied, 343 U.S. 907 (1952)

26

DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT

1451878.1

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

# **CERTIFICATE OF SERVICE**

I declare that I am a citizen of the United States and a resident of Los Angeles, California or employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Tucker Ellis LLP, 515 South Flower Street, Forty-Second Floor, Los Angeles, California 90071-2223.

On August 12, 2019, I served the following document entitled **DEFENDANT IOAN LUCA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT OR IN THE ALTERNATIVE, AN ADVERSE JURY INSTRUCTION CONCERNING THE GOVERNMENT'S REMOVAL OF EXCULPATORY WITNESSES FROM THE JURISIDICTION OF THE COURT** on the interested parties in this action by:

**(X)** **ELECTRONICALLY VIA ECF:** the above-entitled documents to be served electronically through the United States District Court, Central District ECF website, addressed to all parties appearing on the Court's ECF service list. A copy of the "Filing Receipt" page will be maintained with the original document in our office.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 12, 2019, at Los Angeles, California.

*/s/ Marc R. Greenberg*
Marc R. Greenberg

1451878.1

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis