TUCKER ELLIS LLP
Marc R. Greenberg - SBN 123115
marc.greenberg@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:    213.430.3400
Facsimile:    213.430.3409

Attorneys for Defendant IOAN LUCA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br>IOAN LUCA,<br><br>       Defendant. | Case No. 2:19-cr-00354-VAP<br><br>**AMICUS BRIEF RE: THE GOVERNMENT'S REQUEST THAT THE COURT FINANCIALLY REWARD ALLEGED CO-CONSPIRATORS WITH A PORTION OF THE CRIMINAL FINE THEY PERSONALLY CAUSED**<br><br>Date: December 20, 2019 |

On December 20, 2019, the Court will sentence Defendant Capital Ship Management. The Court will also be asked to reward certain crew members with a percentage of the fine paid by their former employer, Capital Ship Management. The government's brief provides less than a complete picture of the conduct at issue in this case and the individual responsibility of the persons the government asks that this Court reward. Therefore, this Amicus Brief is submitted to more fully describe the conduct that occurred on the vessel and in particular two of the crew members that the Court is being asked to reward with substantial payouts.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. <u>The Court Is Being Asked To Reward Illegal Conduct By Unindicted Co-Conspirators</u>

### A. The Government Requests That The Court Reward Bad Conduct.

On December 2, 2019, the Court will sentence the corporate defendant with a fine of up to $500,000. The government has asked that the Court make reward payments pursuant to 33 U.S.C. § 1908(a) to the crew members that were personally involved in the internal transfers that led to the criminal charge of failing to maintain an accurate Oil Record Book.

The initial Indictment returned by the Grand Jury named the proposed reward recipients as unindicted co-conspirators in a conspiracy to pump oily water from the bilges to the Clean Drain Tank and then overboard. The Indictment alleges that all of the Oilers acted at the direction of 4th Engineer Debil. (Indict. ¶9.) When the government realized that it was going to have to immunize the four (4) individuals at issue to enable them to testify at trial a Superseding Indictment was sought renaming these crew members as "engineers" and "oilers" and asked the grand jury to reject the grand jury's prior designation of them "un-indicted" members of a conspiracy.

The government now asks the Court to reward (formerly) unindicted co-conspirators despite their direct involvement in the conduct that resulted in an inaccurate Oil Record Book. The request seeks windfall payments for the very people that were <u>personally</u> involved in the misconduct and who, thereafter, presented false evidence to the Coast Guard and the U.S. Attorney's office.

The government seeks to keep the amount of the payments away from public scrutiny by requesting that the amount of the payments be held under seal. Because these payments are by the Court and not the government the process and outcome should not be hidden from scrutiny. Reward payments to crew members who violated their duties as Ship Officers and employees is controversial and should not be hidden from the public. It is one thing for an employee to claim a whistleblower reward when he reported the issue

to management and no one cared. It is quite another when the misconduct is your own and you and others fail to honor your duty to report the issue to the Captain, the local Port Agent, or directly to the company via the company's hotline or email reporting protocol.

**B. Background Related To The Crew Member's Entitlement to A Reward.**

**i.    Each crew member breached their promise and duty to comply with MARPOL and a duty to report any possible violations.**

4th Engineer Debil claims that he devised the internal transfers months before Chief Engineer Luca was even on the vessel. This means that the claimants requesting payment from the Court had every opportunity to report any concerns to Chief Engineer Luca when he came aboard, the Master, or the company. Captain (Madalin Butoi), an individual all crew members agree was kind and considerate, easy to approach, had an open door policy for all crew, and would have immediately put a stop to any misconduct had he been alerted to it (which he was not).

The attached documents show just how easy it was for anyone on the vessel to report concerns or misconduct to Capital Ship Management:

- Ship to Shore Hot Line Poster, attached as Exhibit A.[1]
- Open Talk Flier, attached as Exhibit B.
- On Board Seafarer's Complaint Procedure, attached as Exhibit C.
- MARPOL Liability Declaration, attached as Exhibit D.
- On Board Poster, "Who Is the Designated Person Ashore", attached as Exhibit E.
- Capital Ship Management, On Board Complaint Procedure, attached as Exhibit F.

Each of the claimants signed a declaration acknowledging their responsibility for their conduct and their promise and obligation to comply with the company's Environmental Protection Policy. (The claimants' signed declarations are Exh. G.) The

---

[1] All exhibit references are to the exhibits attached to the Declaration of Marc R. Greenberg.

Declaration includes yet another notice of the hotline for reporting concerns. None of the claimants made any report whatsoever.

As discussed below, the ring-leaders – Debil and Lopez – discussed the U.S. Reward money while they were still at sea and before entering the port of Los Angeles. If in fact each of the claimants were personally involved in transferring bilge water to the Clean Drain Tank, as alleged in the Indictment and as stated by 4th Engineer Debil, they all violated their duty as seafarers and their duty to their employer.

### ii. 4th Engineer Debil Is The Only Licensed Engineer That Performed The Alleged Transfers – Why Should He Be Rewarded For His Own Misconduct.

On January 11, 2019, the U.S. Coast Guard initiated an investigation of the allegation of shipboard misconduct by a disgruntled crew member who admittedly sought to seek revenge against the Chief Engineer for reprimanding him for failing to perform his work. Under the *Act To Prevent Pollution From Ships* a person giving information which leads to the payment of a fine can receive up to fifty percent of any criminal fine imposed. (33 U.S.C.A. 1901 *et seq.*) This motivates both truthful and untruthful reports. Rewards at the level being requested undermines the ability of shipboard management and shoreside supervision to enforce well established pollution prevention policies and procedures, including internal reporting protocols. It also encourages and endorses the fabrication of evidence, as occurred in this case.

After the Coast Guard initiated its investigation the four (4) crewmembers identified above volunteered to remain in the United States, "for as long as it takes" to testify and obtain their reward. (*See*: Coast Guard Report, re "wellness check".) They were happy to stay because they expected to win a bounty and even without the bounty, Capital Ship Management was required, by the Coast Guard, to pay the crewmembers full salary, including overtime, provide health insurance, pay a hefty per diem, provide lodging in accordance with directions received from the government, and thereafter, pay for return travel for these men. The four crewmembers have stayed together in a hotel and were free

AMICUS BRIEF RE: GOVERNMENT'S REQUEST TO REWARD CO-CONSPIRATORS WITH A PAYMENT OF A PORTION OF THE CRIMINAL FINE THEY CAUSED

to travel around the city. When they were offered the opportunity to return home after a Rule 15 Deposition, they declined, as long as they didn't have to sit for a polygraph examination. (Exh. H.)

There is only one whistleblower in this case, Oiler Lopez.  Mr. Lopez received an oral reprimand and then a written reprimand from the Chief Engineer in December 2019. Exh. I.) Lopez thought, albeit wrongly, that the written reprimand had been transmitted to the management company, at which time Lopez told the Chief Engineer that he was going to "get him." (His actual word choice was far more colorful and threatening.)(Exh. J.) Shortly thereafter, while still on the ship, Oil Lopez spoke with 4th Engineer Debil about the United States' whistleblower reward money. (*See*: Exh. K.)  They discussed how they could receive several year's salary if they could cause a criminal prosecution when they arrive in Los Angeles.[2]

So rather than reporting the 4th Engineer's conduct to anyone onboard the ship, or Capital Ship Management via its hotline, or the company's email system, or by calling the Designated Person Ashore, Oiler Lopez sent an email to the Coast Guard stating that the crew (4th Engineer Debil) had been illegally transferring oily bilge water from the bilge wells to the Clean Drain Tank rather than to the Bilge Holding Tank.

The only explanation given to the Coast Guard why anyone would avoid transferring bilge water to the bilge holding tank was that the Chief Engineer didn't want to dirty the bilge holding tank. This explanation made no sense. The only crew members that would care to keep the bilge holding tank clean would be the crew members that have to clean it - the 4th Engineer and the oilers, including Lopez. The Chief Engineer would not be involved in such work. The bilge holding tank was scheduled to be cleaned in February 2019.

The International MARPOL Treaty requires that bilge water be processed through an oily water separator to reduce the oil content to below 15 parts per million (ppm) before

---

[2] An Oiler is the lowest position on the ship.  The annual salary is approximately $15,000 a year.

being discharged to the sea. To ensure compliance the discharge water passes through an oil content meter that evaluates the effluent and sends the water back to the bilge wells if it exceeds 15 ppm. By transferring the bilge water to the Clean Drain Tank the 4th Engineer could avoid having to operate the oily water separator. Given that the effluent still had to pass through a 15 ppm oil content meter attached to the Clean Drain Tank before going overboard the 4th Engineer felt that it was a no-harm, no foul, violation of policy.

To divert blame from 4th Engineer Debil, Lopez and Debil agreed to tell the Coast Guard that Debil was only following orders so he wasn't responsible for his actions.[3] They claimed that the Chief Engineer directed the 4th Engineer to pump bilge water from the bilge wells to the Clean Drain Tank during the morning meetings conducted in the Engine Control Room and led by the 2nd Engineer. Oiler Lopez and Oiler Velasco claim they heard the Chief Engineer give the instruction to the 4th Engineer and that <u>everyone</u> in the room would have heard it as well, ("Sometimes the entire department would hear these orders at the morning meetings." (Exh. L.) yet:

a. Oiler Suizo told the Coast Guard that he never heard it. He stated that "his knowledge of defendant Luca's orders came from Oiler Lopez", not the morning meetings (Exh. M.);

b. The Ship's Fitter, Mr. Cadar, told the U.S. Attorney's Office on March 1, 2019 that he attended the meetings and never heard the Chief Engineer given such an instruction (Exh. N.);

c. The Ship's Electrician, Mr. Bunda, told the U.S. Attorney's Office on March 1, 2019 that he attended the meetings and never heard the Chief Engineer give such an instruction (Exh. O.);

d. The Second Engineer, Mr. Gavriluta-Strat, told the Coast Guard in a tape recorded interview on the ship and later told the U.S.

---

[3] This is commonly known as the *Nuremburg Defense*. Of course the difference here is that there was ample opportunity to cease the conduct or report any misguided order without the threat of death. The 4th Engineer's conduct could have been reported at any of several ports that the vessel visited before Los Angeles. The Port of Los Angeles was the first port after Lopez was reprimanded by the Chief Engineer for not doing his job properly.

AMICUS BRIEF RE: GOVERNMENT'S REQUEST TO REWARD CO-CONSPIRATORS WITH A PAYMENT OF A PORTION OF THE CRIMINAL FINE THEY CAUSED

  Attorney and testified in a Rule 15 Deposition, the he led the morning meetings and never heard the Chief Engineer give such an instruction.  In fact, he testified that he regretted never telling the Chief Engineer about what the 4th Engineer had done. Do you feel bad – personally feel bad about not reporting suspicious conduct to Chief Engineer Luca - - - Yeah, I feel bad."  (Exh. P);

 e. The Third Engineer also told the Coast Guard that he never heard the Chief Engineer give such an instruction; and,

 f. The Chief Engineer passed a polygraph examination.  He was truthful when responding no to the question of whether he ever directed anyone to pump bilge water to the Clean Drain Tank.  When counsel for Chief Luca asked if the other crew members would also submit to a polygraph examination, Lopez, Velasco, Suizo and Debil all refused. (See: Greenberg Decl. ¶19.)

  Oiler Lopez and 4th Engineer Debil should not be rewarded financially, or otherwise for violating: (1) the ship's rules; (2) their promise to their employer; and, (3) MARPOL; irrespective of whether someone did or did not ask them to do it.  Even if one were to believe Debil and Lopez and disbelieve everyone else, the *Nuremburg Defense* has long been rejected. In fact, it was rejected in Maritime cases even before Nuremburg.  In *United States v. John Jones*, some members of the crew of an American privateer were tried because, during the War of 1812, they stopped and searched a neutral Portuguese vessel on the high seas, assaulted the captain and crew, and stole valuables. They were held guilty of the act. With reference to the defense of Jones and the others that they had only obeyed their captain's orders, the justice said: "This doctrine,... is alarming and unfounded, is repugnant to reason, and to the positive law of the land. No military or civil officer can command an inferior to violate the laws of his country; nor will such command excuse, much less justify the act. Can it be for a moment pretended, that the general of an army, or the commander of a ship of war, can order one of his men to commit murder or felony? Certainly not." *Id,* 26 F.Cas. 657 (1813).  Here, the government gave Debil and Lopez a "get out of jail free card".  That was the executive branch's decision based on the Coast

7

Guard's adoption of Lopez's story. But now, this Court is being asked to issue an order rewarding Debil's and Lopez's intentional misconduct.

Let it not be forgotten that the grand jury's theory, at least as set forth in the Indictment and even the First Amended Indictment, is that 4th Engineer Debil tricked the Oil Content Meter on the Clean Water Tank so that he could pump water containing more than 15 ppm oil into the Ocean. Even without fooling the Oil Content Meter the transfer would, technically, still needed to be documented in the Oil Record Book, but this is a paperwork violation not pollution. (Indictment, page 3, ln. 7-17.) Whether or not 4th Engineer's conduct was only illegal in making the transfer to the Clean Drain Tank but also illegal in tricking the Oil Content Meter defines whether his conduct caused pollution, and is a matter of debate. The government and the grand jury claims that 4th Engineer Debil intentionally tricked the Oil Content Meter, however:

a.  4th Engineer Debil, claims he never tricked the Oil Content Meter;

b.  The method of "tricking" described by Oiler Lopez is not physically possible. Lopez claimed that Debil opened the cap on the OCM and poured mineral water into the top of the senor while the system was running. The fact is, you cannot open the top of the OCM (the white cap) and pour water into the sample chamber. The water pressure going to the sample chamber is 2 bar, or 29 psi. If Debil opened the top of the sample chamber while the system was operating to pour mineral water into the sample chamber the water would not get past the water coming out at 29 psi. The Coast Guard must know this but has yet to take a position on it;

c.  Moreover, Debil had no need to trick the OCM because the water was clean (this is a zero pollution case). Whatever the 4th Engineer was improperly transferring and pumping out of the Clean Drain Tank, it was not "pollution" because it was below 15 ppm. Effluent with an oil content of more than 15 ppm will cause a sheen on the water. The Coast Guard states in their own internal PowerPoint that the water in the Clean Drain Tank was clear, no sheen. The Flag Representatives also found the water in the Clean Drain Tank to be clear, no sheen;

> Debil also stated that he never saw even a sheen on top of the water. (1/11/2019 taped interview, p. 21); and,

d. The forensic evidence of the presence of petroleum in the Clean Drain Tank was so weak that the Coast Guard lab wasn't even able to characterize it. (See: Agent Margelot email to the CG lab wherein he says he doubts the swabs will show anything because the tank was clean.)(Exh. Q.)[4]

Irrespective of who is lying, Lopez or Debil, if *someone* was in fact tricking the oil content meter, it could only have been 4th Engineer Debil. This is the same person that this Court is being asked to reward for his good and honorable conduct. The government has the discretion to reward witnesses, but it is a far different matter when the government asks the Court to reward witnesses that committed the very misconduct that is at the heart of this case. Debil is not deserving of a financial reward from this Court.

### iii. Oiler Lopez Staged Photographs To Fool The Coast Guard.

The government attributes the photographs taken by Oiler Lopez as the strongest evidence of the improper transfers from the bilge well to the Clean Drain Tank by 4th Engineer Debil. "Lopez said that he took the photographs because he knew it was illegal. Also, Luca had threatened to send him home twice before. Luca threatened him and accused him of not doing soundings." (Coast Guard Report 2/19/2019 p. 2, Exh. R.) Oiler Lopez told the Coast Guard that "*they had just completed the portable hose and pump transfer when he took the pictures.*" Id.

Contrary to the statement of the whistleblower, Oiler Lopez, the photographs were not taken after just completing a transfer by the 4th Engineer. Lopez lied to make his story seem more credible ambitious CG investigation and it worked. However, the meta-data

---

[4] Agent Margelot also states in the same email that the "2nd Engineer advises C/E gave all orders and confirmed the transfers." This statement is documented to be false – as proven by the two tape recorded interviews with Margelot and 2nd Engineer Gavriluta-Strat and Mr. Gavriluta-Strat's Rule 15 deposition testimony that he never told the Chief Engineer about the transfers and that he regretted no telling him or the Captain about the 4th Engineer's misconduct. (Agent Margelot's other misconduct in this case is detailed in Defendant Luca's Motion To Dismiss.) This is relevant in that the U.S. Attorney's Office was never fully informed the (mis) conduct within the Coast Guard until August 20, 2019, at which time it was too late to conduct a proper investigation.

from the photographs, captured by the Coast Guard, tell the true story. The meta-data establishes that the photographs were taken as part of a planned set-up to indict the Chief Engineer.



The proof of Lopez's lies comes from three (3) separate, independent, and indisputable facts. The date/time stamp on the photographs provided by Lopez show that the photographs were taken when the engine room was unmanned at night. For example, no one seemed to notice that the photograph relied upon by the Coast Guard was taken on December 31, 2018 at 9:00 pm. (Coast Guard Photo Log, p. 5., Exh. S.)[5] At that time in the evening the engine room was unmanned. Chief Engineer Luca gave everyone extra time off for New Year's Eve. The engine room was regularly staffed from 800 to 1700 every day. None of the Engineers or Oilers worked after 1700. The Coast Guard should have been suspicious of any photographs taken at times when the engine room was unmanned. On December 31, 2018 Chief Engineer Luca ended the shift early, as an accommodation for the fact that it was New Year's Eve.[6] Lopez created the "smoking-gun photograph" when the engine room was empty, on New Year's Eve to fool the Coast Guard.

As a second line of proof, a review of the sounding log, notating the volume of each tank, shows no change in the volume of the Clean Drain Tank from December 31st to January 1st. Therefore, there could not have been a transfer from the bilges to the Clean

---

[5] Photographs identified in the Coast Guard's Log as number 1106, 1109, 1110, 111, 1112, 1113, 1114, 1115 were all captured by Oiler Lopez, according to the Coast Guard, on December 31, 2018 between 9:00:43 pm and 9:01:15 pm. Additional photographs were taken by Oiler Lopez on January 4 and 6 2019 allegedly showing the use of the hose and pump. Once again the photographs lack a power source for the pump and 4th Engineer Debil told the Coast Guard that he did not perform any transfers in January 2019.

[6] Ironically, the oilers were unhappy with the receiving time-off because it meant that they would be paid less.

AMICUS BRIEF RE: GOVERNMENT'S REQUEST TO REWARD CO-CONSPIRATORS WITH A PAYMENT OF A PORTION OF THE CRIMINAL FINE THEY CAUSED

Drain Tank on New Year's Eve. (See: Sounding Log, 12/31/18 to 1/01/2019, volume unchanged. (Exh. T.) [7] The photograph was not documenting history, it was fraudulently intently to create a misleading evidence.



The best evidence that Lopez' New Year's Eve photograph was a "set-up" is visible on the face of the photograph itself. The pump, as seen in the photograph here requires air pressure to operate. All pumps need an energy source and this one requires an air-hose. The photograph copied here shows the actual pump and hoses from the ship. The green valve shows where the air hose must be attached for the pump to operate. (Photograph of the pump taken in the Courtroom during the testimony of 2nd Engineer Gavriluta-Strat.)

Absent from Lopez's New Year's Eve photograph is an air-hose. A rookie mistake by an oiler seeking revenge of a Chief Engineer immediately after being given a written reprimand. The photograph shows a hose going into the bilge well and to the pump and another hose leading from the discharge side of the pump, but no air hose. Unfortunately, the Coast Guard missed this tell-tale sign of Lopez's lie. The Coast Guard's pre-Indictment, internal, PowerPoint includes this very photograph and claims it to be proof that the 4th Engineer was transferring bilge water to the Clean Drain Tank. Unfortunately, none of the eleven (11) Coast Guard officials that reviewed the PowerPoint questioned how a pneumatic pump could magically operate without an air hose. (Coast Guard Power Point attached as Exhibit "U").

Because the Coast Guard bought Lopez's story from the start, the full scope of Lopez's false statements to the Coast Guard has not been investigated by the Coast Guard. However, the meta-data, coupled with the sounding log, and the lack of a power-source proves, without a doubt, that Lopez's photograph was a set-up by a disgruntled employee in an attempt to get revenge and a substantial windfall reward. Whatever Debil may have

---

[7] The Clean Drain Tank was had a recorded sounding of 44 cm at 17:00 on December 31, 2018 and a sounding of 44 cm the on January 1, 2019 at 8:00 and a sounding of 44 at 17:00.

AMICUS BRIEF RE: GOVERNMENT'S REQUEST TO REWARD CO-CONSPIRATORS WITH A PAYMENT OF A PORTION OF THE CRIMINAL FINE THEY CAUSED

been doing improperly with transfers, this photograph is not evidence of an actual transfer by 4th Engineer Debil from the bilge well to the Clean Drain Tank on New Year's Eve as claimed by Oiler Lopez. Lopez lied to the Coast Guard and likely to the grand jury. (Defendants were not provided with Lopez's grand jury testimony).

## II. Debil and Lopez Should Not Be Rewarded With A Further Windfall.

The indictment and the plea agreements are all based on the assumption that 4th Engineer Debil, with the assistance of Oiler Lopez, at some point in time, improperly transferred bilge water to the Clean Drain Tank without a corresponding entry in the Oil Record Book. Absent that misconduct of Debil and Lopez, there would have been no record-keeping.

The owner of the vessel assumes that 4th Engineer Debil violated the rules and the owner had no choice but to accept vicarious liability for Debil's admitted misconduct. The Chief Engineer has also accepted that it happened and that when he learned about it after the fact, the 4th Engineer's transfers were not notated in the Oil Record Book. (See; Plea Agreement Factual Statements.) All of the liability is dependent upon misconduct by 4th Engineer Debil, with the assistance of Oiler Lopez.

The government asks that this Court financially reward the two (2) people that were most personally involved in the underlying conduct that rendered the oil record book entries to be incomplete. Recall that Debil and Lopez discussed the money that they could make as whistleblowers before the ship arrived in Los Angeles. Thereafter, the false photographic "evidence" was created. As discussed above, either Lopez lied, or the meta-data, sounding logs are lying and the pump magically operated without a power source.

Whatever 4th Engineer Debil and Oiler Lopez were ultimately doing on the high seas in an unmanned engine room at night will never fully be known. What is known is that they bear responsibility for those actions and responsible for their failure to address any concern within the reporting structure painstakingly arranged by Capital Ship Management, before discussing how they could make money as whistleblowers in the United States.

Commonly, the government's request to pay a bounty to whistleblowers is summarily approved by the Court. However, here there is far more to the story than is shared with the Court in the government's request. One of the claimants is the person that is alleged to have made the improper transfers, as alleged in the Indictment, The second claimant states he joined in the misconduct and then, the evidence shows, set up equipment to take photographs as part of a personal vendetta to fool the Coast Guard into blaming the Chief Engineer.

These claimants have already been paid seven months of full salary plus benefits and overtime, despite admitting to conduct that would have resulted in their termination had someone on this ship timely informed management about Debil and Lopez misconduct. Even if their misconduct was done at the direction of the prior Chief Engineer (as they claim), they still had a duty to report it to the Captain and the Company. Their conduct is not worthy of this Court's embrace.

As an officer of the Court, I respectfully submit that the Court should not reward people that were personally involved in the alleged illegal transfers and who then stage photographs to fool the Coast Guard into buying into their effort to blame everyone else and accept no responsibility for their own misconduct.

DATED:  November 4, 2019                    Tucker Ellis LLP


                                            By:  */s/ Marc R. Greenberg*
                                                 Marc R. Greenberg
                                                 marc.greenberg@tuckerellis.com
                                                 Attorneys for Defendant IOAN LUCA

# CERTIFICATE OF SERVICE

I declare that I am a citizen of the United States and a resident of Los Angeles, California or employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Tucker Ellis LLP, 515 South Flower Street, Forty-Second Floor, Los Angeles, California 90071-2223.

On November 4, 2019, I served the following document entitled **AMICUS BRIEF RE: THE GOVERNMENT'S REQUEST THAT THE COURT FINANCIALLY REWARD ALLEGED CO-CONSPIRATORS WITH A PORTION OF THE CRIMINAL FINE THEY PERSONALLY CAUSED** on the interested parties in this action by:

**(X)    ELECTRONICALLY VIA ECF:** the above-entitled documents to be served electronically through the United States District Court, Central District ECF website, addressed to all parties appearing on the Court's ECF service list. A copy of the "Filing Receipt" page will be maintained with the original document in our office.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 4, 2019, at Los Angeles, California.

*/s/ Marc R. Greenberg*
Marc R. Greenberg